No. 04-809

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 79

STATE OF MONTANA,

        Plaintiff and Respondent,

   v.

JOHN RONALD PRICE,

        Defendant and Appellant.

APPEAL FROM:    The District Court of the Sixth Judicial District,
                In and For the County Park, Cause No. DC 2004-45,
                Honorable Wm. Nels Swandal, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                Kevin S. Brown, Paoli & Brown, Livingston, Montana

        For Respondent:

                Honorable Mike McGrath, Attorney General; Carol E. Schmidt,
                Assistant Attorney General, Helena, Montana

                Tara M. DePuy, County Attorney, Livingston, Montana

Submitted on Briefs: November 30, 2005

Decided: April 18, 2006

Filed:

_____
                Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1    A jury convicted John Ronald Price of assault with a weapon, and the District Court for the Sixth Judicial District, Park County, sentenced him to the state prison for a term of twenty years with no eligibility for parole. On appeal, Price raises two issues, which we restate as follows:

¶2    Did the District Court abuse its discretion when it *sua sponte* objected to testimony elicited earlier in the trial, instructed the jury to disregard that testimony, and limited testimony on that same subject by a future witness?[1]

### FACTUAL AND PROCEDURAL BACKGROUND

¶3    Shortly after midnight on April 26, 2004, someone drew a serrated knife across William Yocom's throat, leaving behind a non-fatal slit in his neck. Yocom did not see his assailant. Following an investigation of the incident, the State charged Price with assault with a weapon, in violation of § 45-5-213, MCA (2003).

¶4    Testimony at Price's trial, held September 15 and 16, 2004, established the following facts. The assault took place at Price's residence. At the time, Price shared the house with Frank Fouse. Yocom, who was already acquainted with both Price and Fouse, went over to the house during the late afternoon or early evening of April 25, 2004, to discuss renting a room in Price's basement. After seeing the room, Yocom visited with Price and Fouse in Price's living room. The three socialized for several hours, drinking beer and, later, whiskey. At some point, Fouse and Yocom engaged in "play wrestling" because, according to Yocom, Fouse "wanted to see what I was made

---

[1]The two issues presented by Price are simply two nuances of this one issue.

2

of, pretty much, and just boys will be boys type attitude." The wrestling was so rough that Yocom ended up with a rib fracture which was treated at the hospital later that night, and Fouse exhibited several "raspberries" on his face, which one witness defined as "a rug burn, or you know, something, you'd gotten your skin pulled, it was pink. Not necessarily an abrasion, but some sort of irritant." Meanwhile, as Yocom and Fouse wrestled, Price sat calmly on the couch observing the activity, drinking his beer, and saying nothing.

¶5 The parties dispute what took place next. Yocom and Fouse both testified during the State's case-in-chief that sometime between midnight and 1:00 a.m. on April 26, they were standing in the living room approximately two or three feet apart facing each other and talking. Just then, Price—who Fouse testified had gone to the kitchen—allegedly returned to the living room, walked up behind Yocom, pulled Yocom's head back, "whipped out a knife and slit [Yocom's] throat." Although the knife cut deeply into Yocom's skin, it did not hit any critical structures in his neck and did not cause immediate bleeding. Yocom panicked, attempted to leave the house through the front door, which was locked, ran through the kitchen and ultimately exited through the garage. He flagged down a passing vehicle, and the driver gave him a ride to the hospital where he was treated for his injury. He received twelve stitches.

¶6 There was no evidence that another person had been in the house with Yocom, Price, and Fouse at the time of the assault. Thus, the defense sought to show that Fouse, not Price, had been the perpetrator. For instance, Yocom admitted on cross-examination that if Price had been standing where Yocom claimed he was at the time of the assault,

3

then Yocom would have had to pass by Price when he ran from the living room into the kitchen and out the garage; yet, Yocom did not recall seeing Price at any time during and after the assault. There also was testimony that Yocom, in talking to medical personnel and the investigating officers that night, did not immediately identify the person who had caused his injury and that Fouse and Yocom had interacted at the police station after Fouse had given a statement but before Yocom had given one (an intimation that Fouse had influenced or "contaminate[d]" Yocom's identification of his attacker).

¶7 Of particular relevance to this appeal, Price sought to bolster his theory that Fouse had committed the assault with evidence that Fouse had a propensity for violence. In his opening statement, counsel for Price pointed out that

> the County Attorney [in her opening statement] said that the State has no evidence as to why Mr. Price would slit this guy's throat. Keep in mind, though, when you're trying to figure out who would have a motive, look to [Fouse], the other individual who was there, the guy that was violently wrestling with Mr. Yocom to the extent that ribs have been broken. [Fouse] was the person with the motive that night to slit [Yocom's] throat.

¶8 Price had subpoenaed Mike Francell, who was to testify concerning Fouse's violent character. The prosecutor attempted preemptively to counter this evidence through a number of her own witnesses. For instance, during her direct examination of Fouse she remarked, without objection, "Now, there's also been some allegations by a guy, who used to be one of your friends, that you're kind of a violent guy,"[2] to which Fouse replied, "You know, I guess, that's – everybody has their own opinion." The prosecutor also questioned Fouse's ex-wife, Lisa Fruin, and his ex-girlfriend, Marie

[2]Francell had not yet testified; thus, it appears that the prosecutor was referring to out-of-court allegations.

4

Moore, without objection, concerning Fouse's character when he has been drinking. Fruin testified that, "He likes to play around and be silly. He's really in good spirits, for the most part." When asked whether "he get[s] mean, or violent," she replied, "No, he does not." Similarly, Moore testified that, "He would just, around me, he would always just, you know, he'd be fine. Sometimes he'd say some stuff, but usually it was just, you know, he'd get really drunk and then go to sleep." She stated that she had never seen him "get mean, or violent, when he was drinking."

¶9 In response to this testimony, defense counsel asked Fouse, without objection, "Do you get ornery, or violent, when you drink?" Fouse replied that he does not. Counsel also examined Fouse concerning an incident in which Fouse had armed himself with a butcher knife in anticipation of an altercation with Price. However, counsel did not shake Moore's opinion concerning Fouse's character for violence, and he did not address this issue at all with Fruin. Rather, it appears that he planned to introduce the bulk of his evidence concerning Fouse's propensity for violence through Francell, after the State had rested.

¶10 The foregoing testimony by Fouse, Fruin, and Moore was presented during the State's case-in-chief on the first day of trial. The following morning, prior to resuming the proceedings and out of the jury's presence, the District Court *sua sponte* raised an objection to the evidence introduced thus far concerning Fouse's character:

> [T]he Court, listening to testimony yesterday had a real question. So, before we go any further, I want some answers. [¶] I am not sure, under the rules of evidence, that you can bring all this information up about Frank Fouse. I want to know what the defense's purpose is. . . . I don't think any

5

of this testimony about Frank Fouse is admissible. What's your point in doing this? Or, can you tell me where you can, under the rules of evidence.

¶11    In response, defense counsel presented two grounds:

First off, we're contending that Mr. Fouse is the person that actually did the assault. So, I would argue that his propensity for violence, or not violence, would be admissible. [¶] Either way, the prosecution opened the door by asking his girlfriend, or ex-girlfriend, whether he was violent, or not. And I think the prosecution, on direct, asked him if he's violent on the stand, so the door was opened by the State by asking him, are you violent? . . . So, I think I'm entitled. The door is open. If there was no grounds otherwise, the door is now open. The State can't ask him and have him, and his girlfriend, ex-girlfriend, say that he's not a violent person, and then not have me be able, then, to put a witness on to say otherwise.

¶12    Counsel also provided an offer of proof concerning Francell's expected testimony:

Francell will say that Fouse used to brag that he was a trained killer. He'll, also, say that Fouse, on one or more occasions, attacked him when his back was turned and therefore he would never – he knew never to have his back to Fouse. In this case, the victim was assaulted from behind. He'll also testify as to, and I quote, Frank would get crazy when he drank. And the State asked Frank how he gets when he drinks.

¶13    The prosecutor argued that because of Price's opening statement characterizing Fouse as the perpetrator, "the State was in a position where we had to ask the witnesses if they'd ever – and I didn't ask [Fouse] if he was violent, I asked him how he acted when he was drinking. So, I'm not sure that the State has opened the door." Thereafter, the court ruled that Price could question Francell only as to how Fouse behaves when he drinks. In addition, after bringing the jurors in, the court instructed them as follows:

Members of the jury, the Court has determined that there was testimony yesterday about the propensity for nonviolence, or violence, of a witness named Frank Fouse. The Court has determined that is not relevant testimony. It should not be considered by the jury, in any manner, when arriving at a decision in this case.

6

¶14    In conformity with the court's ruling, defense counsel later questioned Francell as follows:

> Q. Did you have occasion to be around Mr. Fouse when he was drinking?
>
> A. A few times, yes.
>
> Q. How did he get when he was drinking, when you were around him?
>
> A. Ignorant, stupid, wild. He's a pretty violent guy.

¶15    Immediately following this testimony, the defense rested, and the parties gave their closing arguments, during which defense counsel emphasized Fouse's character and violent behavior on the night of the assault:

> Now, you saw Frank Fouse on the stand, and you can judge for yourself his demeanor and what you think of him. You're entitled to ask yourselves if he seemed like the kind of guy, or looks like the kind of guy, that's capable of doing that. And we ask that you do apply your judgment in that case.
>
> . . . .
>
> Now, you heard the witness here today, that we called, who testified. Mike Francell testified, that when he drinks, Frank gets violent, that he gets wild.[3]
>
> . . . .
>
> Now, all the evidence, all the testimony, what is Ron Price doing that night? He's calmly sitting on the couch, drinking a beer.
>
> What is Frank doing? By the State's own testimony, he is violently wrestling with Yocom, to the extent that Yocom had a broken rib, and to the extent that Frank has raspberries on his face. Now, who knows what

---

[3]At this point, the prosecutor objected, claiming that counsel had misstated Francell's testimony. The court sustained the objection, believing that "[Francell] didn't say [Fouse] got violent," but also indicating that "the jury has to rely on their own memory."

was going on? Who knows if Frank got mad and slit his throat in anger? Who knows if they were fooling around and he accidentally slit his throat, just playing with him? Because it wasn't a deep cut, I mean, maybe, they were playing around. And Yocom doesn't remember.

But, clearly, Ron Price is just sitting there calmly. Everybody that testified has testified that all their dealings with Ron have been calm. They've never seen Ron violent, or act this way. But we know that Frank was being violent that night, violent enough to break Yocom's rib.

¶16 The jury deliberated approximately nine hours and returned a verdict of guilty. This appeal followed.

## STANDARD OF REVIEW

¶17 We review discretionary trial court rulings, including trial administration issues and evidentiary rulings, for "abuse of discretion." *State v. Beavers*, 1999 MT 260, ¶ 20, 296 Mont. 340, ¶ 20, 987 P.2d 371, ¶ 20. In determining whether a trial court abused its discretion, the question is not whether the reviewing court agrees with the trial court, but rather whether the trial court acted arbitrarily without the employment of conscientious judgment or exceeded the bounds of reason, resulting in substantial injustice. *See State v. Ferguson*, 2005 MT 343, ¶ 22, 330 Mont. 103, ¶ 22, 126 P.3d 463, ¶ 22; *Porter v. Porter* (1970), 155 Mont. 451, 457, 473 P.2d 538, 541. Notwithstanding this deferential standard, however, judicial discretion must be guided by the rules and principles of law; thus, our standard of review is plenary to the extent that a discretionary ruling is based on a conclusion of law. In such circumstance, we must determine whether the court correctly interpreted the law. *See State v. Incashola*, 1998 MT 184, ¶ 9, 289 Mont. 399, ¶ 9, 961 P.2d 745, ¶ 9. The burden to demonstrate an abuse of discretion is on the party

8

seeking reversal of an unfavorable ruling. *See State v. Sheehan*, 2005 MT 305, ¶ 18, 329 Mont. 417, ¶ 18, 124 P.3d 1119, ¶ 18.

## DISCUSSION

¶18 *Did the District Court abuse its discretion when it* sua sponte *objected to testimony elicited earlier in the trial, instructed the jury to disregard that testimony, and limited testimony on that same subject by a future witness?*

¶19 As described above, the District Judge raised a *sua sponte* objection the second day of trial to testimony concerning Fouse's propensity for violence. He determined that this evidence was inadmissible and, accordingly, imposed limitations on any future testimony on this subject. He also instructed the jury that the prior testimony was "not relevant" and "should not be considered by [you], in any manner, when arriving at a decision in this case." Price claims that these actions—"volunteering" the objection, limiting future testimony, and instructing the jury to disregard the earlier testimony— constituted an abuse of discretion that impaired Price's defense. He maintains that he is entitled to a new trial.

*A. The District Court's Objection*

¶20 With respect to the court's *sua sponte* objection, Price points out that "[a] trial judge must take care to insure that he does not abandon his role as impartial judge in favor of that of an advocate" (citing *State v. Stafford* (1984), 208 Mont. 324, 331, 678

9

P.2d 644, 648). However, he has not persuaded us that by raising the objection at issue here, the District Judge crossed the line between arbiter and advocate.[4]

¶21 To be sure, in our adversarial system, the development of the facts is a task primarily assigned to counsel, and the role of the trial judge is to regulate the proceedings and ensure that the trial is fair. *See State v. McConville* (1922), 64 Mont. 302, 308, 209 P. 987, 989. "'The purposes and modes of thought of the advocate and the judge are different and no person can successfully enact the dual role of prosecutor and judge. They are inconsistent.'" *State v. Richardson* (1924), 69 Mont. 400, 404, 222 P. 418, 419 (quoting *People v. Judycki* (Ill. 1922), 134 N.E. 134, 137). For this reason, the judge should avoid "officious interference" in the proceedings, *Richardson*, 69 Mont. at 403-04, 222 P. at 419, and must at all times maintain "impartiality in demeanor as well as in actions," *United States v. Hickman* (6th Cir. 1979), 592 F.2d 931, 933 (internal quotation marks omitted). *See also People v. De Jesus* (N.Y. 1977), 369 N.E.2d 752, 755-56; *People v. Martinez* (Colo. 1974), 523 P.2d 120, 121; *Greenhow v. United States* (D.C.App. 1985), 490 A.2d 1130, 1136; *State v. Thornburgh* (Iowa 1974), 220 N.W.2d 579, 585; Canons 5 and 15, Montana Canons of Judicial Ethics (1963).

¶22 At the same time, however, "[t]he presiding judge is not a mere figurehead or umpire at the trial. It is his province to see that justice is done." *McConville*, 64 Mont. at 308, 209 P. at 989. Thus, he is not required to remain silent and passive throughout a

---

[4]The judge volunteered a number of objections during the course of the trial; however, Price challenges only the objection pertaining to the evidence of Fouse's propensity for violence. Thus, we do not address whether the court's other *sua sponte* interruptions constituted improper advocacy.

jury trial, speaking only to rule on motions or objections. *See* McCormick on Evidence (5th ed. 1999) (hereinafter, "McCormick"), § 55, at 247 ("A party's failure to object . . . does not preclude the trial judge from excluding [inadmissible] evidence on his own motion if . . . the judge believes the interests of justice require the exclusion."). To the contrary, it is his duty to conduct the trial in a manner calculated to ensure fairness, avoid needless consumption of time, keep from the jury extraneous matters likely to mislead them, and facilitate the ascertainment of truth. *See State v. Dickens* (1982), 198 Mont. 482, 486, 647 P.2d 338, 341; *State v. LaMere* (1980), 190 Mont. 332, 339-40, 621 P.2d 462, 466; *State v. Cassill* (1924), 70 Mont. 433, 453, 227 P. 49, 57; *Richardson*, 69 Mont. at 403, 222 P. at 419; Rule 611(a), M.R.Evid.

¶23　In the case at hand, it is evident that the District Judge raised the challenged objection not to influence the minds of the jurors concerning Price's guilt, but rather to address the real possibility that they could be misled by extraneous matters or base their verdict on incompetent evidence. He explained to counsel that "I sometimes don't like to submit my own [objection], but I don't think [evidence of Fouse's propensity for violence] was proper testimony" because "[t]he rules of evidence limit attack of a witness to character for truthfulness, or untruthfulness. What we're doing here is bringing up evidence that – violent, nonviolent, he's not the victim in this case. . . . I don't think any of this testimony about Frank Fouse is admissible." It appears from this explanation that the judge's purpose was to regulate the proceedings so as to ensure a fair trial, not to advocate on behalf of the State. Significantly, unlike a judge with an agenda, the judge here did not immediately rule on his objection. Rather, he solicited and heard arguments

11

from both parties concerning the merits of the objection before issuing a ruling. Moreover, the objection related to testimony elicited by *both* the State and Price the previous day; thus, it had the capacity to adversely affect both parties.[5]  And finally, the judge raised the objection outside the jury's presence, thereby avoiding the risk of appearing in the eyes of the jurors to be on the side of the prosecution.  For these reasons, we conclude that the District Judge did not abuse his discretion in volunteering the objection to testimony concerning Fouse's propensity for violence.

*B. The District Court's Ruling and Jury Instruction*

¶24  As noted above, the District Judge heard arguments from Price and the State (outside the jury's presence) on the merits of his objection.  Defense counsel advanced two arguments against the exclusion of testimony concerning Fouse's character:  (1) "we're contending that Mr. Fouse is the person that actually did the assault.  So, I would argue that his propensity for violence, or not violence, would be admissible"; and (2) "the prosecution opened the door."  Counsel also provided an offer of proof:  witness Francell would testify that Fouse "used to brag that he was a trained killer"; that Fouse, "on one or more occasions, attacked [Francell] when his back was turned and therefore [Francell]

---

[5]The State had an interest in retaining for the jury's consideration the testimony by Fouse, Fruin, and Moore that Fouse did *not* have a propensity for violence, since such evidence made it less probable that Fouse had committed the assault.  *See* McCormick, § 185, at 638 ("[E]vidence that a [person] charged with assaulting a neighbor has a reputation for being non-violent . . . seems to make it less likely that he would commit an assault, presumably because we accept the underlying generalization that fewer people with a reputation for non-violence assault their neighbors than do people with no such reputation.").

. . . knew never to have his back to Fouse"; and that Fouse "would get crazy when he drank."

¶25 The judge ruled that counsel could "ask [Francell] what [Fouse is] like when he's drinking," since "the State opened the door to that [issue]," but nothing more. In response to counsel's inquiries concerning the precise scope of this ruling, the judge clarified that counsel could not let Francell provide examples of things Fouse had done when he was drinking, that counsel could not inquire further about the incident in which Fouse armed himself with a butcher knife in anticipation of an altercation with Price, and that Francell could not testify that Fouse "used to brag that he was a trained killer."

¶26 Price claims that imposing these restrictions on the scope of Francell's testimony was an abuse of discretion. First, he argues that "[t]he State's direct examination of Moore and Fouse opened the door for [defense counsel] to explore Fouse's propensity for violence as well as to call Francell and elicit testimony regarding Fouse' [sic] habit of becoming violent." Yet, the District Judge instructed the jury that the "testimony yesterday about the propensity for nonviolence, or violence, of a witness named Frank Fouse"—the evidence to which the State had opened the door—"is not relevant testimony" and "should not be considered by [you], in any manner, when arriving at a decision in this case." Consequently, given that the court had ruled this testimony irrelevant and so instructed the jury, there was no need for Price to rebut the State's evidence with further testimony on this subject. To be sure, when a party places a matter at issue on direct examination, fairness mandates that the opposing party be permitted to offer contradictory evidence. However, one does not need to refute testimony that the

court has declared irrelevant and that the jury has been instructed not to consider in its deliberations.

¶27 In any event, the limitation imposed by the court on the scope of Francell's testimony was proportionate to the issue to which the State had "opened the door"—specifically, how Fouse behaves when he drinks. Francell, in fact, testified that when Fouse drinks, he gets "[i]gnorant, stupid, wild. He's a pretty violent guy." This testimony was probative of whether Fouse was the actual perpetrator of the assault on Yocom. Indeed, defense counsel echoed Francell's characterization of Fouse during his closing argument, and he reminded the jury that while Fouse had been behaving violently on the evening of the assault—the play wrestling with Yocom, Yocom's broken rib, the raspberries on Fouse's face—Price, by contrast, had been "just sitting there calmly." Thus, the judge's ruling did not prevent Price from countering the evidence presented by the State on the issue of whether Fouse behaves violently when he drinks.

¶28 Besides his "State opened the door" argument, Price submits two additional grounds for the admission of Francell's testimony. First, he contends that the testimony had substantive value—i.e., it supported his theory that Fouse assaulted Yocom—and that, by excluding the testimony, the District Judge precluded him from presenting his theory of the case. Second, he contends that the testimony was admissible for its impeachment value:

> Fouse testified he does not get violent when he drinks. Fouse's ex-girlfriend also testified that Fouse never got mean or violent when he was drinking. That testimony was untruthful. Francell's testimony would have established that both Fouse and Ms. Moore lied to the trial jury when they testified about Fouse's habits and character. Demonstrating that they were

14

> liars could have convinced the jury Price's version of events on the night of the assault was more credible.

Thus, Price suggests that the District Judge precluded him from fully impeaching two of the State's witnesses.

¶29 With respect to the proffered testimony that Fouse would get crazy when he drank, we have already determined that Price was not prevented from presenting the jury with this evidence. Furthermore, Francell's testimony that Fouse gets "[i]gnorant, stupid, wild" when he drinks and that Fouse is "a pretty violent guy" supported Price's theory that Fouse had committed the assault, and it forced the jury to decide whether Fouse, Moore, and Fruin had lied when they testified the previous day about Fouse's habits and character. As such, Francell's testimony served the substantive and impeachment purposes sought by Price.

¶30 With respect to the proffered testimony that Fouse bragged of being a trained killer and that Fouse attacked Francell on one or more occasions when Francell's back was turned, we conclude that the exclusion of this evidence did not preclude Price from presenting his theory of the case or from impeaching Fouse and Moore. Even assuming, arguendo, that there is some merit to the dubious proposition that specific instances of Fouse's propensity for violence were admissible as evidence of his "habit" of behaving violently after he drinks and/or for the purpose of attacking Fouse's and Moore's credibility, such evidence was cumulative. As stated above, defense counsel elicited testimony from Francell that Fouse gets "[i]gnorant, stupid, wild" when he drinks and that Fouse is "a pretty violent guy." Moreover, during his closing argument, counsel

15

highlighted the fact that Fouse had been "violently wrestling with Yocom" that night, and he argued to the jury that Fouse may have "got[ten] mad and slit [Yocom's] throat in anger." Thus, the judge did not abuse his discretion by excluding the remaining portions of Francell's proposed testimony.

## CONCLUSION

¶31 The District Judge did not abuse his discretion by objecting *sua sponte* to evidence of Fouse's propensity for violence when he drinks. The objection pertained to testimony elicited by both parties the previous day; the judge's purpose was to address the possibility that the jurors could be misled by extraneous matters or base their verdict on incompetent evidence; and he solicited and heard arguments from both Price and the State concerning the merits of the objection before issuing a ruling. Thus, we conclude that the judge did not abandon his duty of impartiality in favor of that of an advocate by volunteering this one objection and corresponding instruction to the jury. Rather, his action was in the nature of regulating the proceedings so as to ensure a fair trial.

¶32 Nor did the District Judge abuse his discretion by limiting Francell's testimony to the issue of how Fouse behaves when he drinks. This is the extent to which the State had "opened the door" with testimony concerning Fouse's character, and the judge's ruling was proportional to that testimony. Furthermore, the remainder of Francell's proffered testimony, which the judge excluded, was cumulative of the evidence already before the jury.

16

¶33    Affirmed.


/S/ W. WILLIAM LEAPHART


We concur:


/S/ KARLA M. GRAY
/S/ PATRICIA COTTER
/S/ JOHN WARNER
/S/ JAMES C. NELSON